**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **K.P. et al.**, <br><br> Plaintiffs, <br><br> v. <br><br> **DISTRICT OF COLUMBIA**, <br><br> Defendant. | Case No. 15-cv-01365 (CRC) |

**MEMORANDUM OPINION**

K.P. is an autistic 13-year-old student in the District of Columbia Public School System ("DCPS") who is eligible to receive special-education and related services under the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400 et seq. During the 2013–14 school year, K.P. attended high school in a specialized program for high-functioning autistic students. Pls.' Mot. Prelim. Inj. Ex. 1 ("2015 Hearing Officer Decision") at 5. In October 2014, DCPS changed K.P.'s placement from the specialized autism program within her high school to a larger, mixed-disabilities program in the same school. Id. K.P.'s parents objected to this change in placement and eventually brought a due process complaint challenging the change and DCPS's alleged failure to include sufficient information in K.P.'s Individualized Education Program ("IEP") to comply with the IDEA.

A hearing officer reviewed the due process complaint and, on June 29, 2015, found that the change in placement, and DCPS's failure to provide information in K.P.'s IEP about the type of classroom setting she needed, had denied K.P. a free and appropriate public education ("FAPE"). Consequently, the hearing officer ordered DCPS to "convene an IEP meeting to revise [K.P.'s] IEP to include specific information about [her Least Restrictive Environment ("LRE")], including the classroom size and disability classifications that should be a part of her educational program." Id.

at 14.  The hearing officer also ordered DCPS to begin funding a variety of compensatory educational services for K.P.  Id.  The hearing officer, however, declined to order a non-public placement, because K.P. "was able to make academic progress and demonstrate appropriate behaviors [in her public placement] prior to the placement change in October 2014," and thus a non-public placement would not be "the least restrictive environment in which [she] can make academic progress."  Id. at 13.  Plaintiffs bring this action primarily to enforce the majority of the hearing officer's decision and the hearing officer's order to convene a meeting of K.P.'s IEP team, revise her IEP, and provide K.P. with compensatory education.  Compl. 13.  Plaintiffs also ask this Court to overturn the hearing officer's finding that a non-public placement is not K.P.'s least restrictive environment.  Id.  Attempting to bring these two claims under the IDEA, Plaintiffs seek injunctive relief in the form of a "stay-put" order pursuant to 20 U.S.C. § 1415(j), asking that DCPS "maintain K.P.'s then-current educational placement during the pendency of all proceedings."  Pls.' Mot. Prelim. Inj. 1.

Now before the Court is the Magistrate Judge's Report and Recommendation, entered on August 28, 2015, recommending that Plaintiffs' Motion for Temporary Restraining Order and Plaintiffs' Motion for Preliminary Injunction be denied.  The Court finds that this suit is primarily an action to enforce a favorable decision of a hearing officer and that Plaintiffs' narrow challenge to one of the hearing officer's findings is contingent on resolution of the enforcement issue.  Because the Court holds that there is no right of action under the IDEA to enforce the favorable decision of a hearing officer, and that Plaintiffs' limited challenge to the hearing officer's decision is not ripe for review, the Court will adopt in part the report of the Magistrate Judge and accept in full the recommendations of the Magistrate Judge.

**I.     Background**

The Magistrate Judge provided a detailed explanation of the factual and procedural background of this case in Parts I and II of the Report and Recommendation. The Court adopts in full those explanations, reproduced with stylistic modifications as Sections I.A and I.B of this Memorandum Opinion.

   A.    Factual Background

K.P. is an autistic 13-year-old student in the District of Columbia Public School System. 2015 HOD at 4. K.P. is eligible to receive special-education and related services under the Individuals with Disabilities Education Improvement Act. See id. Because of K.P.'s eligibility under the IDEA, DCPS was required to (and did) convene a meeting of a multidisciplinary team to develop an IEP for K.P. See 20 U.S.C. § 1414.

   1. 2013 IEP

In June 2013, K.P.'s IEP contained provisions for many special-education services. These services were chosen as a result of meetings between K.P.'s parents and her IEP team at her school. Pursuant to the 2013 IEP, K.P. was to receive 26.5 hours per week of special education outside a general-education setting. 2013 IEP at 9. K.P. was also to receive 120 minutes per month of speech-language therapy. Id. K.P.'s 2013 IEP further required that K.P. receive certain classroom accommodations, including small-group testing. Id. at 11.

   2. 2013 Hearing Officer's Decision (HOD)

On September 3, 2013, K.P.'s parents filed a "due process complaint" with DCPS's Office of Dispute Resolution, challenging several aspects of the 2013 IEP. 2013 HOD at 2; 20 U.S.C. § 1415(b)(7)(A). As a component of their relief, K.P.'s parents sought for DCPS to fund K.P.'s attendance at a private-school special-education program, alleging that her current public-school program was insufficient. 2013 HOD at 19–20. On November 26, 2013, the hearing officer issued

his decision regarding Plaintiffs' complaint. See id. As part of his findings of fact, the officer observed that

> 10. [K.P.'s] 2013 IEP provided that [she] would receive full-time Specialized Instruction in the Outside General Education setting and 120 minutes per month of Speech-Language Pathology Outside General Education. The IEP identified [K.P.'s] proposed Exit Category as "H.S. Diploma" and provided that she would participate in the Regular Statewide DC-CAS Assessment with accommodations. Exhibit R-10.
>
> 11. For the 2013-2014 school year, [K.P.] is in a self-contained class at City High School. There are five students in the class. The teaching staff are a High School Special Education teacher and a classroom teaching assistant.

### 3. May 2014 IEP

In May 2014, K.P.'s IEP was revised. Under this 2014 IEP, K.P. was to receive 26.25 hours per week of special education outside a general-education setting. 2014 IEP at 10. K.P. was also to receive 90 minutes per month of speech-language therapy and 120 minutes per day of behavioral-support services, both provided on a consultation basis. Id. at 10. K.P.'s IEP further required that K.P. "should be able to test with a familiar adult" and should be tested in small-group settings. Id. at 10, 12.

### 4. Pre-October 2014 Placement

During the 2013–14 school year, K.P. attended high school in a specialized program for high-functioning autistic students. 2015 HOD at 5. K.P.'s education included the following elements from at least late in the 2012–13 school year until October 2014: (1) K.P. was taught in a single classroom of no more than 5–6 students permanently assigned to the classroom; (2) all of K.P.'s classmates had similar and compatible disabilities; (3) K.P. received 100% of her instruction from the same teacher and in the same classroom, with the exception of one elective class; (4) K.P. was exposed to her non-disabled peers only when she entered or exited the building, transitioned to her elective, and went to lunch; (5) transitions were made when general-education students were in class in order to minimize K.P.'s contact with general-education students; (6) K.P. and her

classmates were escorted from point to point in the school in order to minimize their exposure to general-education students; and (7) at lunch, K.P. sat in a less populated section of the cafeteria because of her aversion to the noise and stimuli in the main section of the cafeteria.  Id.  None of these elements was expressly required by K.P.'s 2014 IEP.  See generally 2014 IEP.

### 5. October 2014 Change

In October 2014, DCPS changed K.P.'s placement from the specialized autism program within her high school to a larger, mixed-disabilities program in the same school.  2015 HOD at 5.  Plaintiffs allege that DCPS changed K.P.'s placement to the larger program because DCPS eliminated K.P.'s former program.  See Compl. ¶ 12. Prior to changing K.P.'s placement, DCPS did not convene an IEP meeting or involve K.P.'s parents in the decision because DCPS considered the change "purely administrative."  2015 HOD at 6.  In this new program, several aspects of K.P.'s education changed:  (1) K.P. transitioned among multiple teachers in several different classrooms throughout the day, in addition to transitioning to her elective class; (2) K.P. had 10–12 students permanently assigned to her class; and (3) K.P. was exposed to students with a variety of disabilities, including some with behavioral difficulties.  Id. at 5–6.

K.P.'s parents immediately contested DCPS's change in placement.  Id. at 6.  DCPS reiterated that the change was "administrative" and that K.P. and her parents had no right to participate in the decision.  Id.  After the program change, K.P.'s behavior deteriorated—she began defying her teachers and having dangerous outbursts in class.  Id.  Further, although K.P.'s 2014 IEP was amended to include 120 minutes of behavioral-support services per month, these services did not improve K.P.'s behavior in her new placement.  Id. at 6–7.  K.P.'s grade point average dropped to some extent after the October 2014 classroom change; however, she continued to earn good grades.  Id. at 8.

5

### 6. 2015 HOD

In May 2015, K.P.'s parents filed another due process complaint, this time contesting the change in K.P.'s placement and DCPS's failure to include sufficient information in the 2014 IEP to comply with the IDEA. Id. at 4. K.P.'s parents again requested that DCPS fund K.P.'s attendance at a private-school special-education program, since DCPS no longer had any program in place similar to K.P.'s pre-October 2014 program. Id. A due process hearing was held on May 26–27, 2015. At that hearing, K.P.'s special-education teacher testified regarding the features of K.P.'s pre-October 2014 educational environment (outlined above). Id. at 5. She further testified that DCPS's unilateral change in K.P.'s placement caused K.P.'s behavior to significantly deteriorate, including assaultive outbursts which had not occurred before the placement change. Id. at 6.

On June 19, 2015, the hearing officer issued her decision, finding in favor of K.P. on most, but not all, issues. See id. at 22. The officer found that the 2014 IEP "indicates that K.P. is to receive 26.25 hours per week of specialized instruction outside of the general education setting; however, it does not indicate . . . that [K.P.] requires a very small classroom setting with little to no transitions during the school day, little to no interaction with non-disabled students, and placement with students with similar/compatible disabilities." Id. at 7. The hearing officer further found that "[w]hile [the] Case Manager and possibly other members of the [IEP] team shared an unwritten understanding that [the IEP] pointed to [K.P.'s] need for intensive small group instruction, the IEP itself lacks this language or any detailed description of the specific needs [K.P.] has exhibited with respect to her all-day classroom setting." Id. at 8. Nonetheless, the hearing officer ordered no specific relief concerning the elements of an appropriate educational program for K.P. See id. at 14–15. Rather, the hearing officer ordered DCPS to "convene an IEP meeting to revise [K.P.]'s IEP to include specific information about . . . classroom size and disability classifications that should be a part of [K.P.'s] educational program." Id.

The hearing officer also rejected DCPS' argument that the change in K.P.'s programs was merely an "administrative change" and found that the change in programs "was significant enough [of a] difference that it amounted to a placement change" because it had "a significant impact on [the] needs [K.P.'s] IEP team agreed she has." Id. at 12. The hearing officer further found that "[K.P.] was placed in a classroom setting in October 2014 that was not consistent with her demonstrated needs and did not meet her needs." Id. at 10.

However, the hearing officer denied plaintiffs' request for placement in a private-school special-education program. Id. at 13. In analyzing that request, the hearing officer made several statements that appear to be recommendations as to specific elements that should be a part of K.P.'s educational environment. See id. Those include: (1) "[K.P.] requires a great deal of structure in the classroom, a low student-teacher ratio, and a small class size to access the curriculum, and made progress in such a setting at District High School prior to October 2014"; (2) "[K.P.] needs a small classroom setting (5–7 students or less) to make academic progress"; and (3) "[K.P.] requires a small classroom setting, few transitions and distractions, classmates with similar disabilities, familiar adults, and limited interaction with non-disabled peers." Id.

7. July 2015 IEP Meeting

Pursuant to the 2015 HOD, K.P.'s parents attended an IEP meeting at DCPS central offices on July 15, 2015. Aff. of Ida Holman ("Holman Aff."), Mot. Prelim. Inj. Ex. 3, ¶ 6. Though the hearing officer ordered DCPS to convene a meeting of the student's IEP team, none of K.P.'s IEP team members were present. Id. ¶ 8. Instead, DCPS convened the meeting with DCPS' "summer IEP team," which included no individuals who had met with, observed, evaluated, taught, counseled, or otherwise interacted with K.P. DCPS' summer IEP team acknowledged that they had no personal knowledge of K.P. Id.

At that meeting, DCPS disclosed that K.P. would be placed in essentially the same setting as her post-October 2014 environment. Id. ¶ 9. That setting would include: (1) classes of 12–16 students; (2) three daily transitions between classrooms and three different teachers; and (3) exposure to non-disabled peers during transitions. Id. ¶¶ 10–13. Further, the IEP team directed that K.P. receive 26.75 hours per week of special education outside a general-education setting. 2015 IEP at 12. K.P. was also to receive 60 minutes per month of speech-language therapy and 120 minutes per month of behavioral-support services, both provided outside a general-education setting. Id. at 12. Like the 2014 IEP, K.P.'s 2015 IEP further required that K.P. "should be able to test with a familiar adult" and should be tested in small-group settings. Id. at 12, 14. Additionally, the 2015 IEP required that: (1) K.P. be tested in a "location with minimal distractions"; (2) her classes be held outside the general education population; and (3) her classes have no more than 12 students and a maximum 1:8 student-teacher ratio, except for elective courses, which could have as many as 16 students while maintaining the 1:8 student-teacher ratio. Id.

At the conclusion of the meeting, plaintiffs stated that they disagreed with the 2015 IEP because it did not comply with the 2015 HOD. Holman Aff. ¶ 14. Plaintiffs refused to sign the new IEP. Id. Plaintiffs requested that K.P. be provided a placement similar to the one she enjoyed prior to October 2014, a request which was denied. Compl. ¶ 40.

### B. Procedural Background

Plaintiffs filed suit in the district court on August 25, 2015, challenging the hearing officer's denial of their request for placement in a private-school special-education program, and DCPS's failure to comply with the 2015 HOD. See generally Compl. Plaintiffs immediately sought injunctive relief through motions for a temporary restraining order and for a preliminary injunction. Plaintiffs seek injunctive relief in the form of a "stay-put" order pursuant to 20 U.S.C. § 1415(j). Proposed Order, Mot. Temp. Restraining Order Ex. 2. Plaintiffs ask the Court to order that

"[DCPS] . . . maintain K.P.'s placement as set forth in the June 19, 2015 hearing officer's decision." Id. Plaintiffs further ask the Court to order DCPS to provide notice of "any public programs that can replicate K.P.'s then-current educational placement and, if no public programs are available, [] provide notice of all non-public programs that can replicate K.P.'s then-current educational placement." Id. The Court referred this matter to the Magistrate Judge for full case management, who recommended that Plaintiffs' motions be denied.

## II.    Standard of Review

The Court must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which" the parties have objected. 28 U.S.C. § 636(b)(1). It "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id. Although the standard of review is *de novo*, the Court may, "in the exercise of sound judicial discretion," rely as it sees fit "on a magistrate's proposed findings and recommendations." United States v. Raddatz, 447 U.S. 667, 676 (1980).

## III.    Analysis

Despite noting "that IDEA proceedings are pending in this matter," the Magistrate Judge did not directly address the threshold issue of whether Plaintiffs may bring suit at all under the IDEA to enforce the favorable decision of a hearing officer. Because the Court concludes that the IDEA does not provide a right of action to enforce such a decision, it finds that Plaintiffs may not seek relief in this Court for their claim that DCPS failed adequately to implement the hearing officer's decision. The Magistrate Judge also did not address the threshold issue of whether Plaintiffs' second claim—that the hearing officer erred in finding a non-public placement not to be K.P.'s LRE—was ripe for review. Because the Court concludes that the issues concerning that claim are not presently fit for judicial decision, Plaintiffs may not now seek relief for that claim in this Court, despite the potential hardship that a delay might cause.

### A.    Plaintiffs' First Claim to Relief

Plaintiffs' first claim is that DCPS failed timely to implement the June 29, 2015 decision of the hearing officer directing the school district to convene K.P.'s IEP team and to "include [in her IEP] specific information about [K.P.'s] LRE, including the classroom size and disability classifications that should be a part of her educational program." 2015 HOD at 14. In the context of a hearing officer's determination regarding a due process complaint, the IDEA provides a right of action only to a "party *aggrieved* by the [hearing officer's] findings and decision." 20 U.S.C. § 1415 (emphasis added). Therefore, in order for Plaintiffs to bring suit under the IDEA, they must have been "aggrieved" by the hearing officer's decision. The hearing officer issued a decision "finding in favor of [Plaintiffs] on most issues." Mem. Supp. Pls.' Mot. Prelim. Inj. 5. Because Plaintiffs cannot be aggrieved by a hearing officer's decision in their favor, the IDEA does not provide them with a private right of action to enforce the favorable elements of that decision. Plaintiffs' first claim is thus not properly before this Court.

### 1.    Rights of Action Under the IDEA in the D.C. Circuit

Although the D.C. Circuit has not squarely analyzed the issue, it has indicated that the IDEA does not provide a private right of action to implement or enforce the favorable decision of a hearing officer. In Blackman v. District of Columbia, 456 F.3d 167 (D.C. Cir. 2006), the court observed that "'prevailing parties' at the administrative level . . . ha[ve] no IDEA cause of action," noting that the IDEA "limit[s] cause[s] of action" to *aggrieved* parties. Id. at 172 n.6. And in Moore v. District of Columbia, 886 F.2d 335 (D.C. Cir. 1989), vacated on other grounds, 907 F.2d 165 (D.C. Cir. 1990) (en banc), the court stated that parties who had prevailed in administrative IDEA proceedings were not "part[ies] aggrieved by the administrative decision[s] in [such] cases." Id. at 337. This principle suggests that Plaintiffs are not "aggrieved" by the hearing officer's determination that DCPS denied K.P. a FAPE or by the hearing officer's order that a new IEP team

10

be convened and new information be included in K.P.'s IEP.  After all, Plaintiffs largely prevailed at the administrative level, as they themselves recognize.  Mem. Supp. Pls.' Mot. Prelim. Inj. 5.  And if prevailing parties have no IDEA cause of action, Blackman, 456 F.3d at 172 n.6, then Plaintiffs cannot bring suit in this Court seeking to enforce the relief they were awarded at the administrative level.

A fellow member of this Court recently reached the same conclusion.  In B.D. v. District of Columbia, in a decision that is currently on appeal to the D.C. Circuit, Judge Leon held that "while the IDEA creates a right of action for a party to challenge an adverse decision of an impartial hearing officer, it does not create a cause of action to challenge the implementation of a favorable HOD."  75 F. Supp. 3d 225, 230 (D.D.C. 2014).  In Judge Leon's view, "Plaintiffs can hardly be said to be 'aggrieved' by [a] hearing officer's decision when it awarded them precisely the relief they sought[,] at least with regards to" the relief they were seeking in one portion of their complaint.  Id.  Plaintiffs must pursue that relief, the court held, through the District's Office of the State Superintendent of Education ("OSSE").  Id.; see also 34 C.F.R. § 300.152(c)(3) ("A complaint alleging a public agency's failure to implement a due process hearing decision must be resolved by the [state education agency].").

And that avenue of relief does not appear to be illusory.  According to OSSE's Formal State Complaint Policies and Procedures, "A complaint alleging that a public agency . . . has failed to implement a special education due process hearing officer decision resolving a due process hearing request will be reviewed and resolved by the [State Complaint Office]" of the OSSE.  District of Columbia Formal State Complaint Policy & Procedures at 3, available at http://osse.dc.gov/sites/ default/files/dc/sites/osse/publication/attachments/State%20Complaints%20Policy%20and%20Proc edure.pdf.  This complaint process exists to resolve the very type of claim that Plaintiffs ask this Court to consider, and it is this procedure that Plaintiffs must follow in order to contest DCPS's

11

implementation of the hearing officer's favorable decision. Moreover, as the District explains, "Individuals dissatisfied with the determination [of the State Complaint Office] may seek review in the [District of Columbia] Superior Court." Def's. Response Pls.' Supplemental Mem. (citing District of Columbia v. Sierra Club, 670 A.2d 354, 358–59 (D.C. 1996)). Plaintiffs thus have an adequate administrative channel through which to pursue their first claim, with judicial review as a backstop.

2.   Rights of Action Under the IDEA in Other Circuits

Plaintiffs concede that the "IDEA does not expressly provide [them] the right to enforce [hearing-officer decisions] in federal court," but contend that "numerous courts have found that the IDEA allows parents to do so." Pls.' Supplemental Mem. 4. Plaintiffs are indeed correct that multiple courts of appeals recognize a cause of action under the IDEA to enforce a hearing officer's favorable decision, although there is a split of authority on this point. Plaintiffs rely primarily on Nieves-Marquez v. Puerto Rico, 353 F.3d 108 (1st Cir. 2003), which held that a court may "issue injunctive relief [under the IDEA] when the school system neither appeals from nor complies with a valid administrative order . . . ." Id. at 115. Plaintiffs also emphasize the Third Circuit's determination in D.E. v. Central Dauphin School District that "individuals seeking to enforce a favorable decision obtained at the administrative level are 'aggrieved' for the purposes of the IDEA and may properly pursue such claims in court." 765 F.3d 260, 278 (3d Cir. 2014).

These decisions undeniably support Plaintiffs' position, but they are in tension with statements by the D.C. Circuit, discussed above, that parties who have obtained favorable decisions at the administrative level are not "aggrieved" for purposes of bringing suit under the IDEA. They also conflict with the rule in the Fourth Circuit, which has held that parties who receive favorable administrative decisions from hearing officers "are not parties aggrieved. Thus, the statute does not provide for their access to either the state or federal courts." Robinson v. Pinderhughes, 810 F.2d

1270, 1275 (4th Cir. 1987); see also Moore, 886 F.2d at 337 (favorably citing the holding in Pinderhughes). Thus, at the end of the day, no clear consensus exists as to whether parties who receive favorable decisions from hearing officers may bring suit to enforce those decisions.

Importantly, the cases on which Plaintiffs rely reveal a concern—which the Court certainly shares—that parties who receive favorable hearing-officer decisions would be without adequate remedies should the school district fail to implement those decisions. In Nieves-Marquez, for instance, the court explained that "Congress could not have intended to leave plaintiffs without an IDEA statutory remedy when they succeed before the hearing officer and the school system . . . simply fails to fulfill a continuing obligation to provide services." 353 F.3d at 115–16. The court went on to express discomfort with the idea that the plaintiffs' only remedy in that case would be the uncertain possibility of "seek[ing] a writ of mandamus from the state court to enforce the administrative order." Id. at 116 n.2. By contrast, as the Court has already detailed, Plaintiffs in this case have an adequate remedy in the form of the OSSE complaint process. Thus, the policy concerns underlying the court's decision in Nieves-Marquez are not present here.

In the Court's view, prior case law in the D.C. Circuit hews most closely to the Fourth Circuit's view that the IDEA does not provide a right of action to enforce favorable administrative decisions because parties who receive those decisions are not aggrieved thereby. Because Plaintiffs in this case were not aggrieved by the hearing officer's favorable findings and determinations, they cannot bring suit under the IDEA to enforce that hearing officer's decision, but must seek relief instead under the administrative procedures available to them under D.C. law. Therefore, the Court has no jurisdiction to hear Plaintiffs' First Claim for Relief, and it consequently cannot enter an injunction or "stay-put" order on the basis of that claim.

B.      Plaintiffs' Second Claim to Relief

Plaintiffs' second claim is that the hearing officer wrongly determined that a non-public placement was not the least restrictive environment in which K.P. could access her education. In Plaintiffs' view, by "ruling that a non-public setting would be too restrictive because K.P.'s IEP had previously been implemented in a public school program that has since been eliminated, the hearing officer has effectively barred K.P. from attending a placement which can implement her IEP." Compl. ¶ 65. Plaintiffs argue that the Court should overturn this "narrow" aspect of the hearing officer's decision. Id. ¶ 66.

Although this claim does challenge a hearing officer's finding, it is not yet ripe for review and thus is not properly before the Court. To determine whether a claim challenging an administrative "decision is ripe for review, [a court] must examine the 'fitness of the issues for judicial decision' and the 'hardship to the parties of withholding court consideration.'" Wyo. Outdoor Council v. U.S. Forest Serv., 165 F.3d 43, 48 (D.C. Cir. 1999) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967)). "A case is fit for judicial resolution when it does not depend upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" Mead v. Holder, 766 F. Supp. 2d 16, 26–27 (D.D.C.) (quoting Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580–81 (1985)), aff'd sub nom. Seven-Sky v. Holder, 661 F.3d 1 (D.C. Cir. 2011). The purpose of assessing ripeness is to ensure that the questions before the Court "are essentially legal rather than factual in nature, and the challenged [administrative] action is sufficiently final to assure that a real controversy exists." Gulf Oil Corp. v. U.S. Dep't of Energy, 663 F.2d 296, 310 (D.C. Cir. 1981). "[T]he question of ripeness may be considered on a court's own motion." Nat'l Park Hospitality Ass'n v. U.S. Dep't of Interior, 538 U.S. 803, 808 (2003).

Although delaying judicial review may increase the amount of time that K.P. spends in a potentially inappropriate placement, the issues that the Court would need to consider to resolve

14

Plaintiffs' challenge are simply unfit for judicial decision at the present time. For the Court to rule in Plaintiffs' favor on the claim that the hearing officer erroneously concluded that a non-public placement was unnecessary for K.P., the Court would first have to evaluate whether a public placement can "address [her] disabilities and educational needs." HOD at 13. But until DCPS convenes a meeting of K.P.'s IEP team and includes in K.P.'s IEP "specific information about [her] LRE, including the classroom size and disability classifications that should be a part of her educational program," 2015 HOD at 14, the Court has no way of assessing whether a non-public placement is K.P.'s LRE or whether DCPS could accommodate her educational needs in a public setting instead. Plaintiffs appear to concede as much: "Without this information," it is impossible "to ensure that K.P. is placed in an appropriate placement []or to ensure that adequate services are being provided in the placement." Compl. ¶ 60.

Moreover, Plaintiffs ask the Court to remedy the hearing officer's finding by "order[ing] the District to either create a public school placement capable of implementing K.P.'s program *or* to fund her attendance at a non-public placement." Id. at 13 (emphasis added). As Plaintiffs recognize, then, a non-public placement may not be the only setting that can provide K.P. with a FAPE. A non-public placement may or may not be K.P.'s LRE, but the Court cannot appropriately make this determination until the issues surrounding enforcement of the hearing officer's otherwise-favorable decision are resolved. And the outcome of the administrative process that Plaintiffs would need to follow to resolve those enforcement issues is uncertain. Plaintiffs may, for instance, succeed in an administrative appeal on their claim that DCPS failed to implement the hearing officer's decision in a timely manner. Winning that appeal may lead to a revision to K.P.'s IEP that provides all the information Plaintiffs seek and spurs DCPS to create "a public school placement" that Plaintiffs believe is "capable of" meeting K.P.'s needs. Id. But because this Court's assessment of K.P.'s LRE would be largely contingent on the outcome of that process, it is not

presently in a position to evaluate Plaintiffs' narrow challenge to the hearing officer's determination.

The Court recognizes that lingering uncertainty over K.P.'s educational placement benefits none of the parties—least of all K.P. The first step to removing that uncertainty, however, is for Plaintiffs to address their primary claim through the appropriate administrative channels. Until that claim is resolved by the relevant authority, Plaintiffs' claim to reverse the non-public-placement finding of the hearing officer is not ripe. Therefore, the Court will not hear Plaintiffs' Second Claim for Relief at this point in time, and it consequently cannot enter an injunction or "stay-put" order on the basis of that claim.

### IV.   Conclusion

For the foregoing reasons, the Court will deny Plaintiffs' Motion for a Temporary Restraining Order and Motion for a Preliminary Injunction. An appropriate order accompanies this Memorandum Opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date:   September 18, 2015