# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **K.P.**, *et al.*, | |
|                Plaintiffs, | |
|                v. | Case No. 15-cv-1365 (CRC) |
| **DISTRICT OF COLUMBIA**, | |
|                Defendant. | |

## MEMORANDUM OPINION

Plaintiffs Bridgette Palmer and her daughter Khadija[1] seek $375,042.27 in attorneys' fees and costs after prevailing in a years-long effort for "stay-put" relief under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq*. Defendant District of Columbia disputes several aspects of their motion: (1) the number of hours billed; (2) the hourly rates at which they were billed; (3) the use of current rates; and (4) the award of expert witness fees under D.C. law.

The Court will grant the Palmers' motion in part. Specifically, it will award fees for all hours billed except for fifteen hours on remand; it will do so at 75% of the rates requested; it will apply current rates rather than historical ones; and it will award the Palmers expert witness costs under D.C. law, as well as other costs—undisputed by the District—under the IDEA. The total award comes to $277,718.60.

## I. Background

The IDEA guarantees developmentally disabled children a free appropriate public

---

[1] As reflected in the case caption, courts typically refer to minors by their initials alone. However, because Khadija is now over eighteen and her briefing includes her full name, the Court follows suit.

Education ("FAPE"). 20 U.S.C. § 1412(a)(1)(A). To effectuate this guarantee, the IDEA requires local school systems to develop an individualized education program ("IEP") for each disabled student. Id. § 1412(a)(4).

Khadija Palmer is autistic. Shortly after she began high school in October 2012, Khadija was placed in a specialized program for high-functioning autistic students at Cardozo High School within the District of Columbia Public School System ("DCPS"). See Compl. ¶ 11. In October 2014, DCPS eliminated Khadija's program and transferred her to a larger program that differed from her previous placement in several ways: larger class sizes; instruction by multiple teachers in multiple classrooms; a mix of students with a variety of different disabilities; and greater interaction with non-disabled peers. Id. ¶¶ 14–17.

Khadija's parents objected to the change, leading to an administrative hearing in May 2015. A hearing officer concluded that the change in placement and DCPS's previous failure to include in Khadija's IEP information about appropriate classroom settings had denied her a FAPE. Id. ¶¶ 23–30. The hearing officer ordered DCPS to craft a new IEP for Khadija but denied the Palmers' request for an order requiring DCPS to fund Khadija's placement in a private-school program resembling the Cardozo program in which she had been previously enrolled.

In July 2015, DCPS convened a "summer IEP team" that included no one who had interacted with Khadija during the school year. Id. ¶¶ 32–33. At that IEP meeting, it disclosed that Khadija would be placed in a similar setting to her post-October 2014 placement—with a larger class size than her pre-October 2014 placement, multiple teachers, and more interaction with non-disabled students. Id. ¶¶ 34–39.

In August 2015, the Palmers filed suit in this Court, contesting the administrative hearing
2

officer's denial of private-school placement, as well as DCPS's new IEP for purported failure to comply with the hearing officer's decision. They sought injunctive relief in the form of a "stay-put" order that would entitle Khadija, while IDEA proceedings pended, to a placement in a public- or private-school program with the same elements as her pre-October 2014 placement at Cardozo. See 20 U.S.C. § 1415(j) ("[D]uring the pendency of any proceedings conducted pursuant to [the IDEA] . . . the child shall remain in the then-current educational placement of the child").

This Court, adopting the recommendation of a magistrate judge, denied stay-put relief in September 2015, K.P. v. District of Columbia, No. 15-1365, 2015 WL 5542991 (D.D.C. Sept. 18, 2015), prompting the Palmers to file an appeal on October 16, 2015. Nearly four months later, on February 10, 2016, the D.C. Circuit stayed the case pending resolution of another matter. After it lifted the stay, the Circuit heard oral arguments in the case on December 9, 2016 and reversed this Court's denial of stay-put relief on March 31, 2017. K.P. v. District of Columbia, 690 F. App'x 10 (D.C. Cir. 2017). All told, nearly 18 months had passed between the Palmers' appeal and its resolution.

By the time the case returned to this Court on remand in April 2017, Khadija was nearing her high school graduation and had been accepted for admission to Trinity Washington University. DCPS explained that a stay-put order—*i.e.*, moving Khadija to a program that resembled her pre-October 2014 placement—would jeopardize her ability to graduate on time and attend college. At a post-remand hearing, it became clear that this outcome was not in Khadija's best interests and went against her wishes. Consequently, while the Court granted the stay-put injunctive relief, see April 11, 2017 Order, ECF No. 33, it stayed the injunction to allow Khadija to graduate, see April 18, 2017 Order, ECF No. 38. Instead, it allowed the Palmers to

3

amend their complaint to seek compensatory education that would remedy the harm caused by her inability to attend an appropriate program between October 2014 and her spring 2017 graduation. In December 2017, an administrative hearing officer granted Khadija that relief, ordering the District of Columbia to fund 170 hours of tutoring and 20 hours of mentoring services for her. See Mot. for Briefing Schedule, ECF No. 59, at 1.

## II. Analysis

### A. Attorneys' Fees

The Palmers seek fees for the work of lawyers Alana Hecht, Charles Moran, Stevie Nabors, and Charles Sibert, as well as paralegal Joseph Golinker. Ms. Hecht's services focused on the Palmers' initial administrative action, while the others' work focused largely on subsequent proceedings in this Court and the D.C. Circuit. See Pls.' Mot. for Attorneys' Fees ("Pls.' Mot.") Ex. 4, ECF No. 61-6 ("Hecht Statement of Account"); Pls.' Mot. Ex. 5, ECF No. 61-7 ("Moran DDC Statement of Account"); Pls.' Mot. Ex. 6, ECF No. 61-8 ("Moran DC Cir. Statement of Account"); Pls.' Mot. Ex. 7, ECF No. 61-9 ("Moran Remand Statement of Account").

The IDEA allows a court to award "reasonable attorneys' fees . . . to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B)(i). These fees must "be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished." Id. § 1415(i)(3)(C). Courts must apply a "two-part framework" for determining whether fees are reasonable, considering "(1) the 'number of hours reasonably expended in litigation'; and (2) the 'reasonable hourly rate' for the services provided." Reed v. District of Columbia, 843 F.3d 517, 520 (D.C. Cir. 2016) (quoting Eley v.

District of Columbia, 793 F.3d 97, 100 (D.C. Cir. 2015)). The District challenges the Palmers' calculation of both the number of hours billed and the rates at which they were billed.

   *1. Number of Hours Billed*

The Palmers have submitted billing records that include fees for all aspects of their action, including the underlying administrative proceeding, initial proceedings in this Court, an appeal to the D.C. Circuit, and this Court's remand proceedings. See generally Hecht Statement of Account; Moran DDC Statement of Account; Moran DC Cir. Statement of Account; Moran Remand Statement of Account.

The District objects, asking the Court to award fees for only the underlying administrative proceedings.[2] See Defs.' Opp'n, ECF No. 63, at 26–27. The crux of the District's contention is that the Palmers pursued a misguided litigation strategy that led to a pyrrhic victory. By the time the Palmers got the injunctive relief they sought, Khadija was months from successfully completing her senior year, which led the Court to stay the injunctive relief to allow her to graduate. Per a subsequent administrative proceeding, she is entitled to

---

[2] The parties have briefed this issue under two theories. First, they debate whether these hours were reasonable and thus compensable under the IDEA. Second, the District—apparently responding to an anticipatory argument in the Palmers' opening brief—contends that the Court should punitively reduce fees under 20 U.S.C. § 1415(i)(3)(F)(i), which allows the Court to reduce fees if it finds that Plaintiffs "unreasonably protracted the final resolution of the controversy[.]" The Palmers, for their part, insist that this provision is inapplicable because the District violated the IDEA, meaning the aforementioned provision cannot apply, under 20 U.S.C. § 1415(i)(3)(G). The parties' wrangling over the interplay of these two subsections misses the point: at bottom, the District appears to insist that, because the Palmers' attorneys billed fees for an unreasonable strategy, what they seek is not encompassed by the IDEA's allowance for "*reasonable* attorneys' fees." 20 U.S.C. § 1415(i)(3)(B)(i) (emphasis added). Thus, the District's contention goes more to the threshold question of whether the Palmers seek "reasonable attorneys' fees" than to the secondary question of whether the Court can or should reduce those fees under subsections 1415(i)(3)(F) and (G). In any event, the same reasons informing the Court's conclusion that these hours were reasonable—namely, that the Palmers had a right to choose their own litigation strategy and litigated it to success—would determine the Court's decision not to reduce fees under subsection (F)(i).

compensatory education instead.  The District insists that the Palmers should have taken a different route and pursued more ordinary administrative proceedings rather than injunctive relief.  The Palmers' chosen strategy, it contends, unreasonably protracted this litigation and denied Khadija meaningful relief.  Essentially, the District asks the Court to penalize the Palmers for a successful, if lengthy, litigation strategy on the theory that better approaches existed.

The Court will not do so.  It was the Palmers' prerogative to choose their own strategy, and they prevailed.  And while delays in the proceedings caused the Court to stay the injunctive relief to which Khadija was entitled, the Palmers' strategy is not solely responsible for the length of this action.  This Court denied stay-put relief, a decision reversed on appeal approximately 18 months later.  Given this history, the Court cannot conclude, based on the benefit of hindsight, that the Palmers' chosen path was unreasonable.  The Court will not play Monday-morning quarterback, especially where the team in question won the game.

However, the Court will reduce the number of hours billed on remand, reflecting the fact that Khadija's lawyers undertook activities against her best interests and stated desires.  Once it became clear that a stay-put injunction meant Khadija would be unable to graduate high school and matriculate at college, her lawyers' opposition to staying that injunction was unreasonable.  As the Court noted at the time, neither Khadija nor those experts who assessed her best interests contended that delaying her graduation was in her best interests. See April 18, 2017 Order, ECF No. 38, at 1.  And the purported reason for opposing a stay of injunctive relief—that a stay would jeopardize Khadija's ability to claim compensatory education—had no basis in law or fact. See id. at 1–2 ("The Court fails to understand the basis for this objection to the District's motion . . . .  Whether K.P. remains at Cardozo so that she can graduate in approximately six weeks would appear to have no bearing on Plaintiff's entitlement to any compensatory-education

6

remedy."). Because it was unreasonable for Khadija's attorneys to oppose the stay, the Court will not award them fees for the hours spent in that endeavor.

But while the District identifies "nearly 60 hours"[3] spent opposing the stay, the Court cannot conclude that this figure is accurate. First, it appears to reflect nearly all hours billed on remand, but there were several aspects of remand proceedings that had nothing to do with the emergency stay motion, and the attorneys' work on those aspects did pursue Khadija's best interests. Second, not all of the work opposing the emergency stay was unreasonable. The statement of account that the Palmers have submitted shows, for example, time devoted to contacting private schools about appropriate placements, see, e.g., Moran DDC Statement of Account at 4, presumably for a few-month enrollment that would still allow Khadija to graduate on time. Similarly, notwithstanding their erroneous insistence that a stay of injunctive relief would jeopardize the ability to seek compensatory education, the Palmers' attorneys reasonably conducted some initial research into that matter. In other words, the attorneys' hours became unreasonable only after it was clear that staying the order would not jeopardize the ability to seek compensatory relief *and* that there were no acceptable alternatives that would allow Khadija to graduate on time. Based on its review of the hours billed, the Court concludes that only about one quarter of the hours billed on remand fell into this bucket and will thus reduce the Palmers' award by $5,000, which is the approximate total for fifteen hours of work.

    2. *Hourly Rate*

Determining whether an attorney's "hourly rate is reasonable turns on three sub-elements: (1) 'the attorney['s] billing practices,' (2) 'the attorney['s] skill, experience, and

---

[3] The District simply cites to two full pages of the statement of account, which is unhelpful in determining precisely to which billed hours it objects. See Def.'s Opp'n, ECF No. 63, at 23 (citing Moran DDC Statement of Account at 4–5).

reputation' and (3) 'the prevailing market rates in the relevant community.'" Eley, 793 F.3d at 100 (alteration in original) (quoting Covington v. District of Columbia, 57 F.3d 1101, 1107 (D.C. Cir. 1995)). The Palmers have submitted attorney statements of account and declarations that contain sufficient detail on the first two factors, and the District does not appear to dispute their attorneys' general billing practices or credentials. Rather, the parties' dispute surrounds the third factor: the prevailing market rates for IDEA litigation in the District of Columbia.

"Fee applicants in IDEA cases have relied on two separate, but inter-related, approaches to providing evidence of prevailing market rate," Reed, 843 F.3d at 521, both of which the Palmers employ. First, the Palmers attempt to show that IDEA litigation constitutes "complex federal litigation," a category of litigation "presumptively" compensable at the rates set forth in a Fee Matrix published by the United States Attorney's Office ("USAO"), which courts routinely apply to determine the prevailing rate for such litigation. Id. at 525. Second, the Palmers attempt to show that IDEA litigators charge and receive fees at the rates set forth in the Matrix, meaning it sets the prevailing market rate even if IDEA litigation is not complex federal litigation—a "means of establishing the 'prevailing market rate' [that] is not conceptually linked to the [USAO] Matrix." Id.

In pursuit of the first path the Palmers rely on declarations from two lawyers, Michael T. Kirkpatrick and Gary E. Mason. See Pls.' Mot. Ex. 20, ECF No. 61-22 ("Kirkpatrick Decl."); Pls.' Mot. Ex. 21, ECF No. 61-23 ("Mason Decl."). These declarations are insufficient. Mr. Mason gives no indication that he has litigated an IDEA case, see generally Mason Decl., and Mr. Kirkpatrick's experience is limited to briefing in opposition to petitions for *certiorari* at the Supreme Court, see Kirkpatrick Decl. ¶ 7, which is hardly representative of the full range of IDEA litigation. While neither declaration contains "[m]ere conclusory statements that IDEA

litigation" is complex federal litigation and each attempts "an explanation of *why* this is so," Reed, 843 F.3d at 525, each falls short of its mark.

Both Kirkpatrick and Mason explain that IDEA litigators often need to master non-legal subject matters. Kirkpatrick Decl. ¶ 9; Mason Decl. ¶ 16. Kirkpatrick adds that "IDEA cases often require a lawyer to review, understand, and synthesize voluminous and complicated educational and psychological records." Kirkpatrick Decl. ¶ 9. In a similar vein, Mason cites the "extraordinarily complicated" determination of remedies, including the need to use experts and understand "the different types of specialized instruction and tutoring . . . as well as the range of therapies" at issue. Mason Decl. ¶ 17. The Court does not doubt that such mastery presents unique challenges at different phases of litigation, including at the remedies phase, but these elements are part-and-parcel of a litigator's need to master non-legal subjects. And as the D.C. Circuit explained in Reed, while "attorneys who litigate IDEA cases may have 'specialized non-legal knowledge[,]' . . . . this is true in a number of specialized fields." 843 F.3d at 525. Here, like in Reed, declarants' explanation that IDEA litigators must have specialized knowledge is insufficient evidence that IDEA litigation is "complex civil litigation."

Both Kirkpatrick and Mason reference the complexity of the IDEA statute, its attendant regulations, and their intersection with state statutes and regulations. Kirkpatrick Decl. ¶ 9; Mason Decl. ¶ 15. True, the IDEA has an extensive legislative history and IDEA litigation implicates laws, regulations, and policies at multiple levels of government, but that is true of many areas of legal practice. Litigators in almost any field must navigate federal statutory and regulatory authority and must often look to state and local authority as well.

Finally, Mason's declaration explains that IDEA litigation's lack of discovery makes it difficult "to systematically develop a case through a variety of discovery tools that gradually

narrow down arguments and defenses," and "makes successful cross-examination a far more difficult task."  Mason Decl. ¶ 19.  But while lack of discovery may pose certain challenges, it may also simplify things.  As the Circuit has explained when confronted with similar arguments, "the absence of discovery may suggest that IDEA cases are not as complex as cases in which discovery is extensive."  Reed, 843 F.3d at 525.

The Palmers correctly note that there has been significant debate in this Circuit as to whether IDEA cases should categorically constitute complex federal litigation as a matter of law.  See, e.g., Reed, 843 at 528 (Tatel, J., concurring) ("I would hold, as a matter of law, that IDEA litigation is sufficiently complex to warrant Laffey rates."); Eley, 793 F.3d at 105 (Kavanaugh, J., concurring) ("[I]n my view, the United States Attorney's Office Laffey matrix is appropriate for IDEA cases.").  But the law as it stands still requires them to prove complexity, a task the Circuit has explained "will not be easy."  Reed, 843 F.3d at 525.  In Laffey v. Northwest Airlines, Inc., which prompted creation of the USAO Matrix's predecessor fee matrix, the litigants presented a "barrage of data, including twenty-five attorney affidavits secured specifically for [the] litigation, information gleaned from affidavits filed in other cases, and fee data reflected in previous judicial decisions."  572 F. Supp. 354, 371–72 (D.D.C. 1983).  Only then did the court deem "the relevant legal market" to be "complex employment litigation[,] . . . subject to the same hourly rates that prevail in other complex federal litigation."  Id. at 374.  The Palmers' submission of two declarations, both of which largely retread arguments that the Circuit has already considered and rejected, is insufficient to prove categorical complexity.

Plaintiffs also pursue the alternative path to claiming USAO Matrix rates: showing that, whether or not IDEA cases are "complex federal litigation," the prevailing market rate is that set forth in the Matrix.  To succeed, the Palmers must "produce satisfactory evidence—*in addition*

10

*to [their] attorney's own affidavits*—that [the] requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Lee v. District of Columbia, 298 F. Supp. 3d 4, 10 (D.D.C. 2018) (quoting Eley, 793 F.3d at 104). Here, the Palmers have proffered declarations only from their own lawyers.

Even construing generously portions of the declarations that reference other lawyers' practices, the Court finds the Palmers have not met their burden. Mr. Nabors, for example, indicates that he has surveyed the IDEA bar and most litigators charge fees in line with the USAO Matrix. Pls.' Mot. Ex. 10, ECF No. 61-12 ("Nabors Decl.") ¶ 4; see also Pls.' Mot. Ex. 9, ECF No. 61-11 ("Hecht Decl.") ¶ 15 (Matrix rates in line with rates charged by other IDEA litigators). Courts in this district have repeatedly observed that "evidence of rates typically 'charged' by IDEA attorneys provides relatively little insight into the rate these attorneys could command in a more traditional market for legal service." Flood v. District of Columbia, 172 F. Supp. 3d 197, 213 (D.D.C. 2016). Absent evidence that the IDEA litigators actually *receive* such rates, the fact that they charge them has little probative value. See James v. District of Columbia, 302 F. Supp. 3d 213, 220 (D.D.C. 2018); Lee, 298 F. Supp. 3d at 13.

And while the declarations and Plaintiffs' briefing highlight a few cases in which IDEA litigators were awarded fees based on the USAO Matrix, in "an overwhelming number of cases," courts in this district have awarded IDEA fees at 75% of the Matrix rates. James, 302 F. Supp. 3d at 222 (quoting Cox v. District of Columbia, 264 F. Supp. 3d 131, 145 (D.D.C. 2017)). Regardless of what lawyers nominally bill, most IDEA cases are compensated at 75% of the USAO rates and there appears to be no shortage of lawyers willing to take such cases. Plaintiffs have not presented sufficient evidence to indicate otherwise.

### 3. Use of Current Rates

The Palmers ask the Court to award fees based on current rates to account for the delay between the time when legal services occurred and when payment will be made. The Supreme Court has allowed adjustment when compensation occurs "several years after the services were rendered." Missouri v. Jenkins, 491 U.S. 274, 283 (1989). Courts in this district have not always approached this question consistently. Compare McNeil v. District of Columbia, No. 14-886, 2018 WL 4680200 at *3 (D.D.C. Sept. 28, 2018) (applying current rates when attorneys had been retained four and six year prior to resolution of fees dispute), with Reed v. District of Columbia, 134 F. Supp. 3d 122, 137 (D.D.C. 2015) (declining to apply current rates when all charges had been billed during the preceding three years "and during that time Plaintiffs were advancing their claims").

In this case, at least some of the delay lies at the courts' feet. Contra Reed, 134 F. Supp. 3d at 137 (noting "no indication of undue delay caused by the District, the Hearing Officers, or this Court"). This Court initially denied the Palmers' stay-put relief, a decision reversed on appeal after an 18-month wait. Given these factors, it is appropriate to award the Palmers fees based on current rates rather than historical ones, a conclusion bolstered by evidence that such a decision will not provide the attorneys windfall profits, see Hecht Decl. ¶¶ 36–38; Nabors Decl. ¶¶ 16–22. Here, use of current rates is thus appropriate to "adequately compensate the plaintiffs for the expected delay in receipt of payment, . . . [and] produce a reasonable fee . . . without generating a windfall for the . . . attorneys." Murray v. Weinberger, 741 F.2d 1423, 1433 (D.C. Cir. 1984).

Consistent with awarding the Palmers attorneys' fees at 75% of the current USAO Matrix Rates, ($365,294.70 x 0.75), plus 50% of USAO Matrix rates for travel time ($1,621.40),[4] subtracting $5,000 for unreasonable hours, the final calculation amounts to $270,592.43.

B. <u>Expert Witness Fees</u>

The Palmers also incurred $6,413.75 in expert witness fees for testimony and evaluation to determine whether Khadija suffered academic harm and the appropriate remedy for that harm. <u>See</u> Pls.' Mot. Ex. 14, ECF No. 61-16; Pls.' Mot. Ex. 16, ECF No. 61-18. The IDEA does not contain a provision for expert witness fees, but under the D.C. Code, the Court may award them such fees up to $6,000, <u>see</u> D.C. Code § 38-2571.03(7)(A), for "actions and proceedings initiated after July 1, 2016," <u>id</u>. § 38-2571.03(7)(F). The parties dispute whether the temporal limitation precludes the expert fees: the District notes that the Palmers filed their administrative complaint in 2014 and filed their lawsuit in this Court in 2015, while the Palmers explain that the expert fees were incurred in 2017 during a hearing on remand following the D.C. Circuit's reversal of this Court's initial order.

The statute's inclusion of the term "actions and proceedings" indicates fees are available for both overall actions and their component parts initiated after July 1, 2016. "A court proceeding is defined as '[a]n act or step that is part of a larger action' and 'an act done by the authority or direction of the court.'" <u>Bloate v. United States</u>, 559 U.S. 196, 218–19 (2010)

---

[4] With several exceptions in which attorneys Charles Moran, Stevie Nabors, and Charles Sibert billed travel time at 100% of USAO Matrix rates, <u>see</u> Moran DC Cir. Statement of Account at 10–11; Moran Remand Statement of Account at 10–11, the attorneys billed their travel time at 50% of USAO Matrix rates. In total, Moran billed two hours of travel time, Nabors billed 5.2 hours, and Sibert billed one hour. At 50% of USAO Matrix rates, this totals $1,621.40. The Court deducts this amount from the total in the calculation of work billable at 75% of USAO rates, and further deducts $1,000 as a rough estimate to account for instances in which Nabors, Moran, and Sibert billed at 100% of USAO Matrix rates.

(Ginsburg, J., concurring) (quoting Black's Law Dictionary 1324 (9th ed. 2009)). In this case, the proceeding at issue was the remand hearing following the D.C. Circuit's reversal—one "step" that was part of the "larger action" that is this whole suit. Because they incurred these fees as part of that proceeding, which commenced after July 1, 2016, and because they have submitted declarations indicating that the rates charged align with prevailing market rates for such services, the Court will award the Palmers $6,000 for these fees.

Adding this $6,000 figure as well as $1,126.17 in IDEA costs[5] to the $270,592.43 attorneys' fee figure, the Court will award Plaintiffs $277,718.60.

### III. Conclusion

For the foregoing reasons, the Court will grant in part Plaintiffs' Motion for Attorneys' Fees and Costs. A separate Order shall accompany this Memorandum Opinion.

CHRISTOPHER R. COOPER<br>
United States District Judge

Date: November 27, 2018

---

[5] The District does not dispute that the Palmers are owed $1,126.17 in costs under the IDEA. See Def.'s Opp'n at 27.